UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

REMEDI SENIOR CARE OF OHIO, LLC,

               Plaintiff,

v.

MIKO ENTERPRISES, INC., et al.,

               Defendants.

_____/

Case No. 1:20-cv-148

Honorable Hala Y. Jarbou

## OPINION

      This is a diversity action asserting the following claims under Michigan law:  breach of contract (Counts I and II); unjust enrichment (Count III); tortious interference (Count IV); fraud (Count V); violation of Michigan's Uniform Voidable Transactions Act (MUVTA),[1] Mich. Comp. Laws § 566.34(1)(a) (Count VI); and constructive fraud (Count VII).  Before the Court are Defendants' motions to dismiss Counts I, III, IV, V, VI, and VII of the complaint for failure to state a claim.  (ECF Nos. 15, 16, 29, 39.)[2]

### I. Background

      Plaintiff Remedi Senior Care of Ohio, LLC, is a Maryland company that provides pharmaceutical products and services to healthcare providers, including nursing and long-term care facilities.  On November 8, 2017, it entered into an agreement (the "Agreement") with Defendant Miko Enterprises, Inc. ("Miko"), to provide pharmaceutical products and services to skilled nursing facilities in Michigan managed by Miko, including Defendants Belding Christian

_____

[1] Formerly known as the Uniform Fraudulent Transfers Act.

[2] Defendant Healthbridge, LLC, asks to join the motions and replies of other defendants.  (ECF Nos. 19, 61.)  The Court will grant its motions for joinder.

Nursing Home, Inc. ("Belding"), Cascade Care Center, Inc. ("Cascade"), Cedar Care Center, Inc. ("Cedar"), Glenwood Christian Nursing Home, Inc. ("Glenwood"), Greenridge Nursing Center, Inc. ("Greenridge"), Greenville Care Center, Inc. ("Greenville"), and Healthbridge, LLC ("Healthbridge") (collectively, the "Facilities").  Miko managed the Facilities and entered the Agreement on their behalf, but Miko Holdings, Inc. ("Miko Holdings") owned and operated the Facilities.  Miko and Miko Holdings are owned by Defendant Mark Piersma.

The Agreement provided that Remedi would be the exclusive supplier of prescription medications and supplies to the Facilities during the term of the Agreement, which was set to expire in April 2021.  (*See* Agreement § 5.1, ECF No. 1-1.)  The parties intended that the Agreement would be "binding upon, and inure to the benefit of, each Party's successors, assigns and transferees, including, without limitation any entity which shall succeed [the Facilities] as manager or operator of the nursing home located at the address[es]" set forth in the Agreement. (*Id.* § 6.17.)

Remedi alleges that, in March 2018, CTR Partnership, L.P. ("CTR") agreed to purchase the real estate and some personal property of several Facilities, including Cedar, Glenwood, Greenridge, Greenville, and Belding for $41,250,000.  Eight months later, CTR agreed to purchase the real estate and some of the personal property of Cascade.  After each of these purchases, CTR leased the real estate and personal property back to these Facilities to allow them to continue operating.

After that, the Facilities struggled.  In September 2019, they defaulted under their respective leases by failing to pay rent and fulfill other obligations to CTR.  Later that month, CTR filed an action in this Court, requesting the appointment of a receiver over the Facilities.  *See CTR P'ship, L.P. v. Cedar Care Ctr., Inc.*, No. 1:19-cv-758 (W.D. Mich.).  In response to this request,

the Facilities acknowledged the need for a new operator, but objected to the appointment of a receiver under the terms proposed by CTR.  CTR subsequently attempted to craft an order appointing a receiver that all the interested parties could agree upon.  (*Id.*, ECF No. 13.)  It represented to the Court in November 2019 that the Facilities had "largely agreed" to the "form" of a proposed order but that other interested parties had not yet given their consent.  (*Id.*, ECF No. 30.)  The Court reviewed the proposed order and raised concerns about it.  Among other things, the Court noted that the proposed order would "permit the receiver to terminate contracts without incurring any obligation to incur liability for the termination[.]"  (*Id.*, ECF No. 31.)

Instead of revising its proposed receivership order to address the Court's concerns, CTR arranged for new entities to take over the operations of the Facilities, obviating CTR's need for the appointment of a receiver, but not necessarily addressing the concerns of other creditors, like Remedi.

Defendants Mission Point of Belding, LLC ("MP Belding"), Mission Point of Forest Hills, LLC ("MP Cascade"), Mission Point of Cedar Springs, LLC ("MP Cedar"), Mission Point of Lamont, LLC ("MP Glenwood"), Mission Point of Big Rapids, LLC ("MP Greenridge"), Mission Point of Greenville ("MP Greenville") (collectively, the "MP Facilities") formed on September 18, 2019, ostensibly for the purpose of continuing the businesses of each of the Facilities.  The MP Facilities are owned and controlled by Defendant Roger Mali, who also owns and controls Defendant Mission Point Management Services, LLC ("MP Management").

On September 27, 2019, a company called Cascade Capital Group formed the following entities who are also Defendants in this action:  Belding MI Property Holdings, LLC ("Belding MI"); Big Rapids MI Property Holdings, LLC ("Big Rapids MI"); Cedar Springs MI Property Holdings, LLC ("Cedar Springs MI"); Grand Rapids MI Property Holdings, LLC ("Grand Rapids

MI"); Greenville Property Holdings, LLC ("Greenville MI"); and Lamont MI Property Holdings, LLC ("Lamont MI") (collectively, "Cascade Holdings").  Cascade Capital Group ostensibly formed these entities to purchase the real property and personal property leased by CTR to the Facilities.

The Facilities transferred their operations and some of their remaining personal property (e.g., licenses, permits) to the MP Facilities on December 17, 2019, via an Operations Transfer Agreement ("OTA").  (*See* OTA, ECF No. 17-3.)[3]  The OTA contemplated that CTR would transfer the real property and other personal property used by the Facilities to Cascade Holdings, under a separate agreement with a closing date of January 31, 2020.  (*See* OTA, PageID.284.) According to Remedi, MP Management assumed management of the Facilities on December 17, 2019, in place of Miko.  No one told Remedi of these changes, however.  The Facilities (and/or Mali, MP Management, and the MP Facilities) continued to purchase Remedi's products and services through the end of January 2020.

On January 8, 2020, Mali sent a letter to Remedi using Miko's stationary.  The letter stated that the Agreement with Remedi would be terminated effective February 1, 2020.

Remedi contends that the Facilities owe it over $500,000.00, and that Mali, MP Management, the MP Facilities, and Healthbridge have "disclaimed any obligations to Plaintiff under the Agreement."  (Am. Compl. ¶ 80, ECF No. 8.)  Remedi seeks to avoid the transfers of assets and to recover compensation for the products and services it supplied.

---

[3] Defendants provided a copy of the OTA.  The Court can consider it because it is referenced in the complaint and central to Remedi's claim.

4

## II. Standard

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."  *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56.  *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).  "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment."  *Gavitt v. Born*, 835 F. 3d 623, 640 (6th Cir. 2016).

## III. Analysis

### A. Count I:  Breach of Contract

In Count I of the complaint, Remedi alleges that the Facilities breached the Agreement by unilaterally terminating it and failing to make Remedi their exclusive provider of pharmaceutical goods and services through the entire term of the Agreement.  The Facilities move for dismissal of Count I, claiming that the Agreement automatically terminated on October 2, 2019, under the following provision:

> In the event that either Party shall: apply for or *consent to the appointment of a receiver*, trustee or liquidator of all or a substantial part of its assets; file a voluntary petition in bankruptcy; make an assignment for the benefit of creditors; file a petition or an answer seeking reorganization or arrangement with creditors or any other benefit under any insolvency law; be the subject of an order, judgment or decree entered upon application of a creditor, adjudicating it as a bankrupt or insolvent, or approving a petition seeking reorganization, or appointing a receiver, trustee or liquidator of all or a substantial part of its assets; or be the subject of an involuntary petition in bankruptcy which shall continue undismissed for a period of ninety (90) days, then, in each such case, this Agreement shall automatically terminate and be of no further force or effect . . . .

(Agreement § 5.2.2, ECF No. 1-1 (emphasis added).)  Specifically, the Facilities argue that they consented to the appointment of a receiver in the *CTR P'ship* case.

As evidence of their consent, the Facilities refer to the following language in their "limited objection" to the appointment of a receiver in that case:

> Defendants do acknowledge that an orderly transition to a new operator is necessary and that the appointment of a receiver—under the terms of an appropriate order— is a first step in that process. Defendants have never said, however, that they will abandon patients and residents, or that Defendants lack the present means to take care of them.

(*CTR P'ship*, Limited Obj. to Pl.'s Emergency Mot. for Appointment of Receiver, ECF No. 13, PageID.615.)[4]

---

[4] The Court takes judicial notice of the record in *CTR P'ship*.

As indicated, however, this language comes from an *objection* to a proposed order for the appointment of a receiver.  An objection is not consistent with consent.  Moreover, when explaining their objection, the Facilities indicated that "CTR has so far been unwilling to take into account or accommodate all interested parties and stakeholders as is evidenced by CTR's proposed receivership order[.]"  (*Id.*, PageID.616.)  The Facilities complained that CTR's proposed order would "jeopardize patient care" because it would deprive Miko of the ability to manage the Facilities.  (*Id.*, PageID.617.)  "As a consequence, [the Facilities] did not and cannot concur with CTR's request for a receiver on CTR's terms."  (*Id.*)  In other words, although the Facilities did not necessarily oppose the appointment of a receiver "under the terms of an appropriate order," they did not consent to that appointment under the circumstances presented to them.  In short, the Facilities objected.  They did not consent.  And CTR subsequently withdrew its request. Accordingly, Defendants' argument for the dismissal of Count I is meritless.

## B. Count III:  Unjust Enrichment

In Count III of the complaint, Remedi alleges that the MP Facilities have been in control of the Facilities' operations since December 17, 2019.  From that date until January 31, 2020, the MP Facilities purchased products and services from Remedi in order to continue operating the Facilities for the benefit of MP Management and Cascade Holdings.  They have not paid for those products.  Accordingly, Remedi claims that the MP Facilities, MP Management, and Cascade Holdings have been unjustly enriched.

The elements of a claim for unjust enrichment are "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by defendant."  *Belle Isle Grill Corp. v. City of Detroit*, 666 N.W.2d 271, 280 (Mich. Ct. App. 2003).

Cascade Holdings rightly contends that Remedi's allegations are not sufficient to state a plausible claim against it.  Remedi argues that Cascade Holdings received an indirect benefit from

the purchase of Remedi's products and services because those purchases allowed the MP Facilities to continue operating the business of the Facilities, providing "substantial value" to Cascade Holdings.  (Pl.'s Response, ECF No. 57, PageID.655.)  However, the complaint does not allege what interest, if any, Cascade Holdings had in the continued operation of the Facilities' business prior to February 1, 2020.  Moreover, to the extent Cascade Holdings owned or acquired real or personal property used by the Facilities, the value of its interest in that property did not necessarily depend upon the success of the Facilities' operations.  The value of real estate, for instance, is independent from the success or failure of a particular business located on that property.

Indeed, Remedi's argument would make a landlord liable for an unjust enrichment claim where its commercial tenant received an inequitable benefit.  Similarly, Remedi's argument would make a shareholder or owner of a business liable where the business received a benefit.  The cases cited by Remedi do not support such results.  In short, Remedi alleges no facts from which to reasonably infer that Remedi's provision of pharmaceutical products and services to MP Management and the MP Facilities conferred a benefit, either directly or indirectly, on Cascade Holdings.  Remedi's allegations in this regard are speculative and conclusory.  Accordingly, the Court will dismiss Cascade Holdings as a defendant to Count III of the complaint.

### C. Count IV:  Tortious Interference

Remedi claims that Mali and MP Management wrongfully instigated a breach of the Agreement by sending a letter to Remedi in January 2020, purporting to terminate the Agreement on behalf of Miko.

Defendants argue that no claim can be stated for tortious interference with a contract that had already terminated in October 2019 due to the Facilities' consent to the appointment of a receiver.  This argument is meritless for reasons discussed above in connection with Count I.

### D. Count V:  Fraud

Remedi also claims that Mali and MP Management committed fraud.  According to Remedi, Mali and MP Management were aware of the Agreement and its terms when they assumed management of the Facilities on December 17, 2019.  They also knew that Remedi had no knowledge of the change in ownership and management of the Facilities.  Nevertheless, Mali and MP Management submitted "daily" orders for products and services to Remedi.  (Am. Compl. ¶ 117.)  In doing so, Mali and MP Management "impliedly and intentionally represented to [Remedi] that they would pay for the products and services as provided for in the Agreement but without any actual intention to fully compensate" Remedi.  (Am. Compl. ¶ 117, ECF No. 8.)

Defendants assert that Remedi has not pleaded its fraud claim with the requisite particularity.  *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  The purpose of this pleading rule is to "provide adequate notice to the defendant of the fraud [the complaint] alleges," and the pleading are deficient if they fail to enable the defendants to "'prepare an informed pleading to the specific allegations of fraud.'"  *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 973 (6th Cir. 2005) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 642 (6th Cir. 2003)).  "'In complying with Rule 9(b), a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"  *Id.* at 972 (quoting *Bledsoe*, 342 F.3d at 643).

Remedi has met the particularity requirement in this case.  It alleges that Mali and MP Management ordered products and services from Remedi, after taking control of the Facilities on December 17, 2019.  The time is daily from December 17, 2019, to February 1, 2010.  The content is simply an order for products or services.  The representation, which was allegedly implied by

9

those orders, is that Mali and MP Management would pay for those products and services in accordance with the Agreement.  The fraudulent scheme was to make such an implied representation without intent to fulfill it.  The injury is that Remedi relied on the representations to its detriment.  These allegations are sufficient to satisfy the particularity requirement.

### E. Count VI:  MUVTA – Fraudulent Transfer

In Count VI, Remedi alleges that Miko, Miko Holdings, and/or Piersma initiated the transfer of the Facilities' assets with the intent to hinder or defraud Remedi by preventing it from recovering from the Facilities what it was owed under the Agreement.  Remedi claims that these transfers are fraudulent under MUVTA, Mich. Comp. Laws § 566.34(1)(a), which provides that a "transfer" made by a debtor is voidable by a creditor where, among other things, the transfer was made "[w]ith actual intent to hinder, delay, or default any creditor of the debtor."  Mich. Comp. Laws § 566.34(1)(a).

#### 1. Particularity

Defendants assert that Remedi has not asserted its claim with the requisite particularity for a claim involving fraud.  Defendants argue that Remedi must allege the following:

> for each transfer:  the date of the transfer; the amount of the transfer (or if the transfer was of property other than money, the property that was transferred and its value); the name of the transferor; the name of the initial transferee; and the consideration paid, if any, for the transfer.

*In re NM Holdings Co.*, 407 B.R. 232, 261 (Bankr. E.D. Mich. 2009).

Remedi's allegations are sufficient, particularly when supplemented by the OTA.  The details of the property transferred are laid out in that agreement, as are the parties and the consideration.  The OTA specifies a purchase price of $60,000 for the assets subject to that agreement.  (*See* OTA § 1.2.)  The OTA also indicates that this price "does not reflect the fair market value of the assets and business being transferred[.]"  (*Id.*)  The latter provides support for

Remedi's claim that the Facilities' transfer of their assets was made with intent to hinder or defraud.  A lack of adequate consideration for a transfer is relevant for determining fraudulent intent.  *See* Mich. Comp. Laws § 566.34(2)(h).

Defendants complain that Remedi's complaint does not identify with particularity an additional transfer that allegedly occurred in January 2020, in which Remedi alleges on "information and belief" that the Facilities transferred to Cascade Capital Group any remaining assets not previously transferred to CTR or the MP Facilities.  (*See* Am. Comp. ¶ 124.)  The Court agrees that the allegation about this transfer is not, standing alone, an adequate basis for a MUVTA claim.  Nevertheless, Remedi's allegations about the transfer occurring in December 2019 via the OTA suffice to satisfy the particularity requirement.

### 2. Transfer

Defendants contend that Remedi cannot show a "transfer," as defined by MUVTA.  A transfer is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an *asset* or an interest in an asset."  Mich. Comp. Laws § 566.31(q) (emphasis added).  An asset is any "property of a debtor," but does not include "[p]roperty to the extent it is encumbered by a valid lien."  Mich. Comp. Laws § 566.31(b)(i).  Defendants contend the assets of the Facilities were not "assets" under MUVTA because they were encumbered by liens granted to CTR in the leases between the Facilities and CTR.  According to Defendants, those leases contained the following provision:

> For the purpose of securing the payment and performance obligations of Tenant hereunder, Tenant, as debtor, hereby grants to Landlord, as security party, a security interest in and an express contractual lien upon, all of Tenant's right, title and interest in and to the Property Collateral, Accounts Collateral and Authorization Collateral (collectively, "**Lease Collateral**").  This Lease constitutes a security agreement covering all such Lease Collateral.  This security interest and agreement shall survive the termination of this Lease resulting from an Event of Default. . . .

(Lease § 20.1, ECF No. 17-1.)

There are several problems with this argument.  First, the Court may not consider the content of the leases in a motion for dismissal under Rule 12(b)(6).  The leases are mentioned in the complaint, but they are not central to any of Remedi's claims.  The Court declines to convert Defendants' motions into ones for summary judgment.

Second, even if the Court could consider the leases, Defendants have provided only a partial copy of one of them.  The one provided is between CTR and Belding.  The Court has no reason to infer that all the leases between CTR and the various Facilities have the same terms.

Third, the lease between CTR and Belding is missing some pages, including the page that defines the term "Property Collateral," which is part of the definition of Lease Collateral. Consequently, the Court cannot tell whether the "Lease Collateral" that is encumbered by a lien encompasses all the property owned by Belding and then transferred to MP Belding.  In other words, the scope of the lien is unclear.  If Belding owned and transferred property not encumbered by a lien, then it may have made a "transfer" of an "asset" under MUVTA.

Fourth, Remedi has not had an opportunity to investigate the leases to determine whether they constitute "valid liens" on the property of the Facilities.  It would be premature for the Court to find or assume that the liens are valid.  Thus, the Court rejects Defendants' argument that Remedi cannot show a transfer.

### 3. Damages

For similar reasons, Defendants contend that Remedi cannot show damages as a result of the transfer of assets to the MP Facilities.  If the liens contained in the leases encumbered all the property owned by the Facilities, as Defendants argue, then there was nothing that Remedi could have recovered from the Facilities.  As a secured creditor, CTR would have been entitled to reimbursement before an unsecured creditor like Remedi.  And according to Defendants, the complaint indicates that the Facilities' debts to CTR were worth more than the value of their assets.

12

These arguments are similarly flawed because they ask the Court to rely on evidence outside the complaint (i.e., the leases), which is not proper under Rule 12(b)(6). And as discussed above, the argument also asks the Court to make inferences regarding the scope and validity of the liens that are not supported by the evidence. Accordingly, Defendants' argument regarding damages is not a proper basis for dismissal.

### 4. Proper Parties

Defendants also contend that Count VI names the wrong parties. The complaint names Cascade Holdings, Miko, Miko Holdings, the MP Facilities, and Piersma as defendants to Count VI. (Am. Compl., PageID.148.) According to Defendants, the agreement transferring the Facilities' operations (and some of their assets) to the MP Facilities is between the Facilities, the MP Facilities, and MP Management. (*See* OTA, ECF No. 17-3.) Consequently, Defendants argue that Cascade Holdings, Miko, Miko Holdings, and Piersma are not proper defendants.

Miko is a party to the OTA, but only with respect to "Section 5.13 and Section 5.16" of the OTA. (OTA, PageID.308.) Section 5.13 requires Miko to "cooperate with [the MP Facilities and MP Management] and do all that is commercially reasonable to effectuate the orderly transition of the management and/or operations of the Facilities . . . ." (OTA § 5.13.) Section 5.16 requires Miko to maintain the confidentiality of certain information. (*Id.* § 5.16.) This sort of limited involvement by Miko is not sufficient to make Miko liable for Remedi's MUVTA claim. There is no plausible basis for inferring that Miko was a party to the asset transfer itself, either as transferor or transferee. Accordingly, there is no basis for granting relief against Miko under MUVTA.

Similarly, the Court discerns no basis for retaining Defendants Cascade Holdings, Miko Holdings, or Piersma as Defendants to the claim, and Remedi offers none in response to Defendants' motions. As to Miko Holdings and Piersma, Remedi merely alleges that they

13

"initiated" the Facilities' transfer of assets in January 2020 for their own benefit.  (Am. Compl. § 126.)  As discussed above, the allegation about the January 2020 transfer of assets is too vague to state a plausible claim.  Moreover, the fact that one of these parties may have had an ownership interest in the Facilities sufficient to control their actions is not enough hold them liable, as Michigan law generally respects "the separate existence of business entities from their owners. This is true even when a single shareholder or member owns the entity." *Alpha Inv., L.L.C. v. Alpha Real Estate, L.L.C.*, No. 291939, 2010 WL 4977902, at *3 (Mich. Ct. App. Dec. 7, 2010) (citations omitted).

As to Cascade Holdings, those entities are not mentioned in the body of Count VI (except through a general incorporation by reference of the rest of the complaint) and the Court cannot discern any reason for including them as defendants to the claim.  As with Miko, there is no plausible allegation that the Cascade Holdings entities were involved in an allegedly fraudulent transfer of assets from the Facilities.

Accordingly, the Court will dismiss Cascade Holdings, Miko, Miko Holdings, and Piersma from Count VI.

### F. Count VII:  MUVTA - Constructive Fraud ("Fraud in Law")

In Count VII, Remedi ostensibly claims that the transfers discussed in the previous section were constructively fraudulent under Mich. Comp. Laws § 566.35.  Remedi names the MP Facilities, Miko, Miko Holdings, Cascade Holdings, Piersma, Mali, and MP Management as defendants to this claim.

> The [MUVTA] defines two species of fraudulent transfers.  The first encompasses transfers made "[w]ith actual intent to hinder, delay, or defraud" a creditor and applies to transfers made either before or after the creditor's claim arose. MCL 566.34(1)(a).  The second, commonly called "fraud in law" or constructive fraud, deems certain transactions fraudulent regardless of the creditor's ability to prove the debtor's actual intent.  It applies only to transfers made after the creditor's claim arose.  Three elements of proof are required: (1) the creditor's claim arose before

14

the transfer, (2) the debtor was insolvent or became insolvent as a result of the transfer, and (3) the debtor did not receive "reasonably equivalent value in exchange for the transfer . . . ."

*Dillard v. Schlussel*, 865 N.W.2d 648, 656 (Mich. Ct. App. 2014) (quoting Mich. Comp. Laws § 566.35(1)).

### 1. Transfer / Harm

Defendants raise some of the same objections to this claim as they raise to Count VI. Defendants argue that: (1) there was no "transfer" because the Facilities' assets were encumbered by liens; and (2) Remedi was not harmed because the Facilities' debt to CTR was worth more than their assets. These arguments are meritless for the same reasons discussed above with respect to Count VI.

### 2. Proper Parties

Defendants also contend that there is no basis for holding Cascade Holdings, Miko, Miko Holdings, MP Management, Mali, or Piersma liable for the transfer. The Court agrees that the facts alleged provide no plausible basis for asserting a claim against Cascade Holdings, Miko, Miko Holdings, Mali, or Piersma. Remedi alleges that Cascade Holdings, Miko, Miko Holdings, the MP Facilities, and Piersma "knew or should have known of the devastating effects that the asset transfer would have on the Facilities and their ability to pay their debts[.]" (Am. Compl. ¶ 136.) And it alleges that these defendants, as well as Mali and MP Management, "were required under the Agreement to ensure that the obligations to [Remedi] were fulfilled but transferred the Facilities' assets knowing that the transferees would disclaim any further obligation to Plaintiff[.]" (*Id.* ¶ 137.) Yet, of the foregoing defendants, only the MP Facilities and MP Management were parties to the transfer of assets that occurred through the OTA. Even assuming the other defendants had obligations to Remedi through the Agreement, it is not clear why they would be liable for a transfer of the Facilities' assets under a theory of constructive fraud. Remedi does not address this

15

issue in its response brief.  Accordingly, the Court will dismiss Cascade Holdings, Miko, Miko Holdings, Mali, and Piersma as Defendants to Count VII.

### 3. Insolvency

Defendants argue that the allegations do not plausibly show that the Facilities were insolvent or became insolvent as a result of the allegedly fraudulent transfer.  The Court disagrees. Remedi alleges, and the OTA shows, that the Facilities transferred away significant assets in December 2019 for less than fair market value.  Not long before, they had defaulted on their leases to CTR.  Indeed, in *CTR P'ship*, the Facilities represented that they had not fulfilled their obligations under the leases due to "difficult financial challenges" and the need to "prioritize expenditures to conserve financial resources for patient care," strongly suggesting that they did not have the resources to pay CTR.  (*CTR P'ship*, ECF No. 13, PageID.616.)  Under these circumstances, it is plausible to infer that the Facilities were insolvent in December 2019, when they transferred assets to the MP Facilities.

### 4. Reasonably Equivalent Value

Defendants critique the complaint for failing to adequately allege that the Facilities did not receive reasonable equivalent value for the transfer of assets.  The OTA indicates otherwise.  Thus, except as to Cascade Holdings, Miko, Miko Holdings, Mali, and Piersma, the Court rejects Defendants' arguments for dismissal of Count VII.

16

**IV. Conclusion**

For all the foregoing reasons, the Court will dismiss Cascade Holdings as a defendant to Count III.  The Court will also dismiss Cascade Holdings, Miko, Miko Holdings, and Piersma from Count VI.  In addition, the Court will dismiss Cascade Holdings, Miko, Miko Holdings, Mali, and Piersma as defendants to Count VII.  In all other respects the motions to dismiss will be denied.

An order will enter consistent with this Opinion.


Dated: February 1, 2021                    /s/ Hala Y. Jarbou
                                           HALA Y. JARBOU
                                           UNITED STATES DISTRICT JUDGE